IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TYLER A. GIUGNI,<br><br>                    Petitioner,<br><br>          vs.<br><br>C. WOFFORD, Warden, Avenal State Prison,[1]<br><br>                    Respondent. | No. 2:12-cv-00122-JKS<br><br>MEMORANDUM DECISION |

Tyler A. Giugni, a state prisoner proceeding *pro se*, filed a Petition for Writ of Habeas

Corpus with this Court pursuant to 28 U.S.C. § 2254.  Giugni is currently in the custody of the

California Department of Corrections and Rehabilitation and is incarcerated at Avenal State

Prison.  Respondent has answered, and Giugni has replied.

## I. BACKGROUND/PRIOR PROCEEDINGS

The California Court of Appeal outlined the background of this case as follows:

> Giugni and [Stephen] Armstrong were convicted of beating a homeless man so
> seriously that he became permanently disabled.
> Joseph Pettaway is an African-American man who in the summer of 2005 was
> living in his car in the parking lot of the Parkway Community Church in Fairfield.  On
> the night of August 17, 2005, Pettaway visited a friend, John Strassberg, who lived in an
> apartment that was adjacent to the parking lot.  Pettaway left Strassberg's apartment
> around midnight to go to sleep in his car.  Sometime thereafter, the power in that area
> went out, and while the power was out, Strassberg heard yelling outside.  He went
> outside to look but did not see anything.
> In the early morning hours of August 18, 2005, D'Mann Thompson was walking
> through the church parking lot when he saw someone lying on the ground.  Thompson

---

[1]      C. Wofford, Warden, Avenal State Prison, is substituted for Anthony Hedgpeth, former Warden, Salinas Valley State Prison.  FED. R. CIV. P. 25(c).

touched the man and asked whether he was all right, but left when he heard the man moan.

That same morning, shortly before 3:00 a.m., Fairfield Police Officer William Shaffer was on patrol when he received a report that a man was down in the parking lot of the Parkway Community Church. Shaffer drove to the church and found Pettaway on the ground outside of his car. He was covered in blood. Pettaway was treated at a nearby hospital and then airlifted to a facility in Roseville for more treatment.

Pettaway's injuries were life-changing. He experienced a severe brain injury and multiple fractures to his face and skull, but no injuries to any other part of his body. As a result of his brain injuries, Pettaway suffers from significant memory loss and a major loss of motor function. He is unable to walk or stand on his own. He is unable to sit without assistance. He is unable to control his body functions. He can only see shadows. Pettaway now resides in a convalescent home.

Authorities investigating the crime ultimately focused on three young men as possible culprits: appellants Giugni and Armstrong, who were 19 and 18 years old respectively, and Corey Reitmeier, who was 17 years old. The theory of the crime was that all three young men attacked Pettaway after a night of excessive drinking.

In December 2006, an information was filed charging Giugni, Armstrong, and Reitmeier with three counts: (1) attempted premeditated murder ([California Penal Code] §§ 187, 664), (2) aggravated mayhem (§ 205), and second degree robbery. (§§ 211, 212.5, subd. (c).)[2]  As is relevant here, the information alleged as to all three counts that the defendants personally had inflicted serious bodily injury within the meaning of section 12022.7, subdivision (b).

FN 2.  The prosecutor subsequently dismissed the robbery counts against Giugni and Armstrong.

The case proceeded to trial where the prosecution presented evidence primarily from four witnesses who had contact with the defendants on the night of the crime: Eric Moosbuchner, Samantha Horton, Angelica Pina, and Christine Meza.

Moosbuchner testified that on the night of August 17, 2005, he met Horton and Pina at a bar. After the bar closed around 2:00 a.m., Moosbuchner agreed to drive both of them to Horton's apartment in Fairfield. At that time, Horton was living with Giugni's brother Will Giugni. When Horton, Pina and Moosbuchner arrived, it was dark because the power was out. Moosbuchner agreed to accompany the women inside. When they opened the door, a man was standing there. Then two other men came walking out of a back room. Horton appeared to know the man in the doorway and he and Horton began to bicker as they walked around the apartment. When the man sat down, Moosbuchner noticed his leg was covered in blood. Moosbuchner asked the man whether he had been in an accident. The man replied, "'No. We pulled some nigger out of a car and beat the shit out of him, kicked his ass.'"  Moosbuchner was shocked and he said, "'So you think that's nice?'"  Deciding that he did not want to be part of what was occurring, he quickly left the apartment.

Horton's recollection was similar in some respects but different in others. She testified that when they opened the door to her apartment Giugni was in front of them, and that two other young men whom she did not know but whom she later identified as being Armstrong and Reitmeier, came out of her bedroom. According to Horton, all three men described what had happened: Armstrong said they had been fighting a "nigger" in the parking lot and that he had kicked the man. Reitmeier said he had kicked the man. Giugni also said they had beaten the man.

Pina testified that when they arrived at the apartment complex, there were "a lot" of police cars in the church's parking lot. When they opened the door to Horton's apartment, they heard noises coming from the back. Horton and Moosbuchner went to investigate and found two people hiding under Horton's bed. Then another man, whom Pina identified as Will Giugni's brother, came out of the patio area. According to Pina, the men said someone tried to jump them in the parking lot and that they "'beat the crap'" out of him. Pina said the boys were "boasting" and "bragging about beating the crap out of somebody."

Christine Meza testified that on August 18, 2005, near 4:00 a.m., she received a phone call from Cory Reitmeier who asked for a ride. Meza picked up Reitmeier and Giugni and drove them to a friend's house. On the way, Reitmeier and Giugni told her that an angry man had attacked Reitmeier after they had bumped into his car and that they "beat the shit out of the guy." Reitmeier then pulled a wallet out of his jacket. The identification inside indicated it belonged to an older black man named Joseph. According to Meza, Giugni had blood on his hand and on his pants. She later told a detective that Giugni had "'blood all over him'" and that "'[y]ou could just smell it.'"

Both Reitmeier and Armstrong testified on their own behalf. Reitmeier said that on the night in question, he, Giugni, and Armstrong were drinking "a lot" of vodka and beer at Will Giugni's apartment. At some point they decided to go home. As they walked through a parking lot, Reitmeier bumped into a car and a "very large" man came out yelling at them. The man took a swing at Reitmeier, who tried to and may have hit him. However, Reitmeier was so drunk he ended up supporting himself against the car. He could not remember much else except that they all went back to the apartment to hide. He and Armstrong hid under the bed.

Reitmeier also presented testimony from a psychologist who stated that Reitmeier's personality was incompatible with the extreme violence. In addition, Reitmeier presented testimony from five witnesses all of whom stated that he is not a violent person.

Armstrong testified that on the night in question, he, Giugni, and Reitmeier went to Will Giugni's apartment where the three of them finished a half gallon of vodka. After the power went out, the three of them decided to go to the apartment complex where Reitmeier and Armstrong lived. As they passed through the church parking lot, Armstrong heard a "knock" on a car. Suddenly, a man ran up to Reitmeier, shouted at him, and took a swing at him. Armstrong ran to Reitmeier and tried to hit the man, but he did not connect. Giugni then ran up to the man and hit him in the face. Armstrong heard three loud cracks and the man fell down grabbing Armstrong's legs. When Armstrong kicked his leg in attempt to get free, his shoe flew off. Armstrong tried to find

his shoe, and as he did, he saw Giugni doing a "little dance thing" next to the man's body.  Armstrong then heard a siren and he, Giugni and Reitmeier ran back to Will Giugni's apartment.

Armstrong also presented testimony from four character witnesses who stated that Armstrong was neither a racist nor a violent person.

Giugni elected not to testify on his own behalf; however, he did present testimony from a Fairfield police detective who stated that Giugni's father, a captain in the Fairfield Police Department, had not taken part in the investigation and had not been informed of the results.  The parties also stipulated that Will Giugni had called his father on the night in question who told him that someone had been beaten up in the parking lot.

The jurors considering this evidence acquitted Giugni of attempted murder, but convicted him of aggravated mayhem and found the great bodily injury allegation to be true.  The jurors acquitted Armstrong of attempted murder and aggravated mayhem, but found him guilty of simple mayhem and found the great bodily injury allegation to be true.  The jurors acquitted Reitmeier of attempted murder and mayhem but convicted him of battery with serious bodily injury (§ 243, subd. (d)) and petty theft.

Subsequently, the court sentenced Giugni to life in prison with the possibility of parole plus a consecutive five-year term for the great bodily injury finding.  The court sentenced Armstrong to four years on the mayhem count plus an additional five years for the great bodily injury finding for a total term of nine years.

*People v. Giugni*, Nos. A124528, A125552, 2011 WL 1134749, at *1-3 (Cal. Ct. App. Mar. 29, 2011).

Giugni filed a counseled appeal, arguing that 1) the trial court erred when it denied his motion for acquittal at the close of the prosecution's case; 2) the court erred when it denied his motion to sever his trial from that of his co-defendants; 3) he received ineffective assistance of counsel; 4) the court erred when instructing the jury; and 5) the court erred when it imposed a great bodily injury enhancement.  The Court of Appeal concluded that the trial court erred in imposing the great bodily injury enhancement but affirmed in all other respects.  *Giugni*, 2011 WL 1134749, at *1.

Giugni filed a counseled petition for review with the California Supreme Court, arguing that: 1) there was insufficient evidence that he intended to permanently disable Pettaway; 2) he was deprived of his right to a fair trial when the trial court denied his motion to sever; and 3) the

trial court erred in instructing the jury.  The California Supreme Court summarily denied review. Giugni filed his *pro se* Petition with this Court on January 5, 2012.

## II. GROUNDS RAISED

In his Petition before this Court, Giugni argues that: 1) there was insufficient evidence that he "intended to disable the victim"; 2) he was denied his "state-created right" to dismissal at the close of the prosecution's case; 3) the court erred when it denied his motion to sever his trial from that of his co-defendants; 4) trial counsel was ineffective for failing to request a particular instruction; and 5) the trial court erred in instructing the jury on self-defense.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is "contrary" to federal law "if the state court applies a rule that contradicts the governing law set forth" in controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision," *Williams*, 529 U.S. at 412, and not circuit precedent, *see Renico v.*

*Lett*, 559 U.S. 766, 778-79 (2010).  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds and not on the supervisory power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Thus, where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"  *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

In applying these standards in habeas review, this Court reviews this "last reasoned decision" by the state court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 804 (1991).  Under the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see also Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

## IV. DISCUSSION

<u>Claims One and Two: Sufficiency of the evidence</u>

Giugni claims that there was insufficient evidence that he "specifically intended to disable the victim," and that the trial court erred in failing to grant his motion for dismissal at the close of the prosecution's case.

The Court of Appeal rejected this claim as follows:

> At the close of the prosecution's case, Giugni's trial counsel moved for acquittal under [California Penal Code] section 1118.1.  The trial court granted the motion as to the robbery count, but denied it as to attempted murder and aggravated mayhem counts. Giugni now contends the trial court erred when it denied his motion for acquittal.
> Section 1118.1 authorizes a trial court to enter a judgment of acquittal "if the evidence then before the court is insufficient to sustain a conviction of such offense or offenses on appeal."  (§ 1118.1.)  A trial court ruling on a motion for acquittal applies the same standard an appellate court applies in reviewing the sufficiency of the evidence to support a conviction.  (*People v. Cole* (2004) 33 Cal. 4th 1158, 1212-1213.)  Where the motion is made at the close of the prosecution's case-in-chief, the sufficiency of the

-6-

evidence is tested as it stood at that point.  (*Id.* at p. 1213.)  On appeal we view de novo whether the evidence presented was sufficient to support a conviction.  (*Ibid.*)  As with other challenges to the sufficiency of the evidence, we must review the evidence in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value-from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. (*Id.* at p. 1212.)

. . . .

As is relevant here, [California Penal Code] section 205 states:  "A person is guilty of aggravated mayhem when he or she unlawfully, under circumstances manifesting extreme indifference to the physical or psychological well-being of another person, intentionally causes permanent disability or disfigurement of another human being or deprives a human being of a limb, organ, or member of his or her body."

Cases interpreting this language have held that aggravated mayhem is a specific intent crime which requires proof the defendant specifically intended to cause the maiming injury, i.e., the permanent disability or disfigurement.  (*People v. Quintero* (2006) 135 Cal. App. 4th 1152, 1162.)  "A jury may not find specific intent 'solely from evidence that the injury inflicted actually constitutes mayhem.'"  (*People v. Szadziewicz* (2008) 161 Cal. App. 4th 823, 831.)  Instead, there must be other facts and circumstances which support an inference of intent to maim rather than to attack indiscriminately. (*Ibid.*)  A jury may infer a defendant's specific intent from the circumstances attending the act, including the manner in which it was done, and the means used.  (*Ibid.*)  Evidence of a "controlled and directed attack" or an attack of "'focused or limited scope'" may provide substantial evidence of a specific intent to maim.  (*Ibid., quoting Quintero, supra,* 135 Cal. App. 4th at p. 1162.)

Giugni argues the evidence here was insufficient because the prosecution was unable to prove that he had "personally struck any blow that injured Pettaway" or that he had "the specific intent to maim."

There was ample evidence that Giugni personally struck a blow that injured Pettaway. Meza testified that Giugni had "'blood all over him'" and that he "'smell[ed]'" like blood.  Moosbuchner testified that when he, Horton and Pina opened the door to Horton's apartment, they were met by a man who was directly in front of them.  When Moosbuchner asked the man why he was covered with blood, the man replied, "'I kicked some nigger's ass.'"  While the identity of that man and precisely what he said was in dispute, substantial evidence supported the conclusion that the perpetrator was Giugni.

The evidence was also sufficient to support an intent to maim.  Giugni's use of a grossly offensive racial epithet to describe the incident to Moosbuchner strongly suggests the attack may have been motivated by racial animus.  Giugni's boasts to Moosbuchner, Pina, and Meza can be interpreted to suggest the attack was intentional.  The nature of the injuries Pettaway sustained, serious injuries to his face and head but nowhere else, strongly suggest a specific intent to maim.  (*See, e.g.*, *People v. Szadziewicz, supra,* 161 Cal. App. 4th at pp. 831-832 [evidence of a "controlled and directed attack focused on [the victim's] face and neck" showed specific intent]; *People v. Quintero, supra,* 135 Cal. App. 4th at p. 1163 [fact that the defendant focused attack on the victim's head and then

-7-

stopped "once he had severely maimed [victim's] face" showed specific intent]; *People v. Park* (2003) 112 Cal. App. 4th 61, 69 [specific intent shown where defendant aimed directly at victim's head and ceased attack after successfully maiming victim].)

Construing the evidence in the light most favorable to trial court's ruling, we conclude the evidence was sufficient.[4]

> FN 4.  Having reached this conclusion, we necessarily reject Giugni's argument that the evidence presented at trial was insufficient to support an aggravated mayhem charge.  Since the evidence presented in the prosecution's case was sufficient to support the aggravated mayhem charge, a fortiori, the evidence presented at trial was sufficient.

*Giugni*, 2011 WL 1134749, at *4-5 (footnote omitted).

As articulated by the Supreme Court in *Jackson*, the constitutional standard for sufficiency of the evidence is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in the original); *see also McDaniel v. Brown*, 558 U.S. 120, 132-33 (2010) (reaffirming this standard). This Court must therefore determine whether the California court unreasonably applied *Jackson*. In making this determination, this Court may not usurp the role of the finder of fact by considering how it would have resolved any conflicts in the evidence, made the inferences, or considered the evidence at trial. *Jackson*, 443 U.S. at 318-19.  Rather, when "faced with a record of historical facts that supports conflicting inferences," this Court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and defer to that resolution." *Id.* at 326.

It is a fundamental precept of dual federalism that the States possess primary authority for defining and enforcing the criminal law.  *See Engle v. Isaac*, 456 U.S. 107, 128 (1982). Consequently, although the sufficiency of the evidence review by this Court is grounded in the

Fourteenth Amendment, it must take its inquiry by reference to the elements of the crime as set

forth in state law. *Jackson*, 443 U.S. at 324 n.16.  This Court must also be ever mindful of the

deference owed to the trier of fact and the sharply limited nature of constitutional sufficiency

review. *Juan H. v. Allen*, 408 F.3d 1262, 1275 (9th Cir. 2005).  A fundamental principle of our

federal system is "that a state court's interpretation of state law, including one announced on

direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."

*Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam).

There was sufficient evidence from which a jury could infer that Giungi had the specific

intent to maim Pettaway.  Giugni danced a victory dance and boasted after the incident,

suggesting the attack was intentional.  His use of a racial epithet also suggests that the attack was

at least in part motivated by racial animus.  In addition, Giugni launched a focused attack on

Pettaway's neck and head, demonstrating that he intended to cause serious harm to Pettaway.

"Circumstantial evidence and inferences drawn from it may be sufficient to sustain a

conviction." *United States v. Jackson*, 72 F.3d 1379, 1391 (9th Cir. 1995).  The Court of

Appeal's conclusion that there was sufficient evidence from which a jury could infer that Giugni

harbored the specific intent to maim Pettaway is not unreasonable or contrary to federal law.

<u>Claim Three: Severance</u>

Giugni next argues that he was deprived of the due process of law when the trial court

denied his motion for severance and for a new trial.  The Court of Appeal set forth the procedural

background of this claim as follows:

> Prior to trial, Giugni moved to sever his trial from that of his codefendants.
> Noting that Armstrong intended to introduce evidence regarding prior acts of violence
> Giugni had committed, Giugni argued that if he was tried with Armstrong, he would in
> effect be faced with two prosecutors.  Armstrong's counsel filed a similar motion arguing

severance was required because he planned to introduce evidence regarding Giugni's prior bad acts.  The prosecutor opposed the motions arguing severance was not required and he disputed the accuracy of the prior incidents of misconduct that Armstrong had identified.

The trial court denied the motions to sever finding that the defendants' statements regarding the beating were adoptive admissions and were admissible in each defendant's case.  With respect to Armstrong's request to introduce evidence concerning Giugni's prior bad acts, the court noted there was a dispute regarding the nature of those acts.  Saying it was reluctant to rule without knowing the precise facts, the court denied the motion "without prejudice" to Armstrong's right to renew it based on an "additional offer of proof with more specificity. . . ."

The trial then commenced and the parties presented their opening statements.  However, subsequently, the prosecutor notified the defendants that Christine Meza had provided additional information about a cell phone video that depicted Pettaway lying on the ground and that had Reitmeier's and Giugni's voices in the background.  Armstrong's counsel argued the cell phone video was exculpatory and he renewed his motion to sever.

The trial court conducted an Evidence Code section 402 hearing to address the issues regarding the cell phone video.  Meza testified that on the morning of the attack, Reitmeier telephoned and asked for a ride.  Meza agreed and as she drove the young men to Reitmeier's residence, Reitmeier showed her a short video on his cell phone.  It was about 30 seconds long and depicted an unclear image of what appeared to be a "man lying down."  Meza said she could hear Giugni's voice in the background saying something she could not recall, and Reitmeier saying something about "a man [lying] in his blood."  Meza did not see or hear anyone else in the video.

After Meza testified, Armstrong's counsel asked that Meza be allowed to testify about the cell phone video arguing that while "there may have been three people in the parking lot" his client was not one of the "people who did the damage[.]"  The trial court excluded testimony concerning the cell phone video finding there was no evidence about whether it was taken "one minute, two minutes . . . [or] twenty minutes . . . post the infliction of the injuries."  Therefore, the court found that the "fact that Mr. Armstrong's voice was not being heard at that point [did] not really prove anything regarding guilt or innocence.  And any probative value [was] outweighed by confusion that could potentially occur if it were admitted."

The case was then tried and the jurors returned the verdicts we have described above.  Subsequently, Giugni filed a motion for new trial arguing the trial had been unfair because his codefendants has presented evidence of their good character, and by doing so, had impliedly characterized him as being a person who *did not* have a good character.  According to Giugni's counsel, the primary problem was the "manner in which the evidence came in[.]"  The other defendants had testified and had presented evidence of their good character which "logically unavoidably . . . sets the other defendant . . . as the odd man out."  The trial court stated it understood counsel's argument but it believed a new trial was not justified.

Giugni and Armstrong both now argue the trial court erred when it denied their motions to sever.

*Giugni*, 2011 WL 1134749, at *5-6.

The Court of Appeal then denied relief as follows:

As is relevant here section 1098 states: "When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order[s] separate trials."  Joint trials are favored because they promote economy and efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.  (*People v. Coffman and Marlow* (2004) 34 Cal. 4th 1, 40 (*Coffman*).)  Where, as here, defendants are charged with having committed a common crime against a common victim, the court is presented with a "classic case" for a joint trial.  (*Ibid.*)  A court's denial of a motion for severance is reviewed for abuse of discretion, judged on the facts as they appeared at the time of the ruling.  (*Id.* at p. 41.)  A court's error in failing to grant severance requires reversal only if it is reasonably probable the defendant would have received a more favorable result in a separate trial. (*Ibid.*)

Applying this standard, we find no abuse.  Turning to Giugni's arguments first, we conclude the court did not err when it denied his pretrial motion to sever.  As we have noted, the primary ground for that motion was Giugni's concern that Armstrong would be allowed to present evidence concerning Giugni's reputation for violence.  However, the trial court denied Armstrong's request to present such evidence ruling Armstrong had not provided an adequate foundation.  Armstrong did not attempt to cure that inadequacy and the evidence was never presented.  Thus, what Giugni's counsel characterized as the "major ground" for his severance motion did not exist.  The court did not abuse its discretion when it denied that motion.

Giugni also contends the trial court erred when it denied his posttrial motion for new trial.  We review the denial of a new trial motion for abuse of discretion.  (*Coffman, supra,* 34 Cal. 4th at p. 127.)  Again, we find no abuse here.

Giugni bases his argument on the fact that Armstrong and Reitmeier were able to present evidence of their good character while he was unable to present similar evidence in his own defense.  Noting that Armstrong's counsel highlighted the character evidence that had been presented, Giugni argues the character evidence that Armstrong and Reitmeier presented "inevitably pointed" to him as being someone who did not have a reputation for peacefulness.

Although many California decisions have stated that the existence of conflicting defenses may compel severance of codefendants' trials, *none* has found an abuse of discretion or reversed a conviction on that ground.  (*People v. Hardy* (1992) 2 Cal. 4th 86, 168.)  Indeed, if the existence of conflicting or antagonistic defenses alone required separate trials, it would negate the legislative preference for joint trials and separate trials would be mandatory in almost every case.  (*Ibid.*)  Accordingly, courts have applied this ground for severance very narrowly.  (*Ibid.*)  Codefendants are deemed not to have antagonistic defenses simply because they accuse one another of the crime or approach one another with hostility.  (*Ibid.*)  Rather, to obtain severance on the ground of

-11-

conflicting defenses, it must be demonstrated that the conflict is so prejudicial that the defenses are irreconcilable and the jury will unjustifiably infer that this conflict alone demonstrates that both are guilty.  (*Ibid.*)  When sufficient independent evidence against the moving defendant exists, it is not the conflict alone that demonstrates his guilt and antagonistic defenses do not compel severance.  (*Coffman, supra,* 34 Cal. 4th at p. 41.)

      Here, the mere fact that Armstrong and Reitmeier did present evidence of their good character while Giugni did not, does not mean that Giugni's defense was irreconcilable with that of Armstrong and Reitmeier.  Even those with sterling reputations occasionally commit serious crimes.  Furthermore and importantly, there was more than sufficient evidence that demonstrated Giugni's guilt.  In addition to the evidence from Moosbuchner that we have described above, Armstrong testified that Giugni struck Pettaway in the face three times causing a loud crack each time, and then performed a "little dance thing" next to Pettaway's body.  On this record, it was "not the conflict alone that demonstrate[d] [Giugni's] guilt. . . ." (*Coffman, supra,* 34 Cal. 4th at p. 41.)

      We conclude the trial court did not abuse its discretion when it denied Giugni's motion for new trial based on severance.

*Giugni*, 2011 WL 1134749, at *6-8 (footnote omitted).

The United States Supreme Court has never held that a criminal defendant has a federal constitutional right to bifurcation.  *Spencer v. Texas*, 385 U.S. 554, 568 (1967) ("Two-part jury trials are rare in our jurisprudence; they have never been compelled by this Court as a matter of constitutional law, or even as a matter of federal procedure."); *see also Marshall v. Lonberger*, 459 U.S. 422, 438 n.6 (1983) (reaffirming *Spencer*).  Therefore, a court may grant habeas relief based on a state court's decision to deny a motion for severance only if the joint trial was so prejudicial that it denied a petitioner his right to a fair trial.  *Zafiro v. United States*, 506 U.S. 534, 539 (1993) (a court must consider whether "there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence"); *Featherstone v. Estelle*, 948 F.2d 1497, 1503 (9th Cir. 1991) ("The simultaneous trial of more than one offense must actually render petitioner's

-12-

state trial fundamentally unfair and hence, violative of due process before relief pursuant to 28 U.S.C. § 2254 would be appropriate.") (internal brackets and citation omitted).

Giugni bears the burden of proving that he is entitled to federal habeas relief, *Davis v. Woodford*, 384 F.3d 628, 638 (9th Cir. 2003), and he must establish that the prejudice arising from the failure to grant a severance was so "clear, manifest or undue" that he was denied a fair trial, *Lambright v. Stewart*, 191 F.3d 1181, 1185 (9th Cir. 1999) (quoting *United States v. Throckmorton*, 87 F.3d 1069, 1071-72 (9th Cir. 1996)).

The California Court of Appeal's conclusion that the trial court did not err when it denied Giugni's pretrial motion to sever did not render Giugni's trial unfair. Evidence concerning Giugni's reputation for violence was never presented, and accordingly his asserted ground for severance never came to fruition.

Giugni also argues that the court should have granted his post-trial motion for severance based on the fact that his co-defendants were allowed to present evidence of their good character, thus allowing the jury to infer that he did not have a similar reputation. Although it does not appear that the Ninth Circuit has directly addressed whether due process may be violated where a trial court refuses to sever trials involving antagonistic defenses, the Second Circuit has answered the question in the affirmative where one of the co-defendants alleges that another co-defendant framed him. *See United States v. Serpoosh*, 919 F.2d 835, 838 (2d Cir. 1990), *overruled by Zafiro*, 506 U.S. at 538. In that case, "Both defendants gave detailed and mutually exclusive explanations of their conduct on the day of the arrest. The damage done was greatly enhanced by the sparring between counsel for the two defendants in which each characterized the other defendant as a liar who concocted the story to escape blame." *Id.*

The Second Circuit later concluded that the Supreme Court overruled *Serpoosh* in *Zafiro*, 506 U.S. at 538.  *See United States v. Haynes*, 16 F.3d 29, 32 (2d Cir. 1994).  In any event, the defenses involved in this case are not necessarily incompatible.  Their versions of events were not mutually exclusive—they all acknowledged their involvement but attempted to shift blame between themselves.  And as the Court of Appeal noted, evidence of his co-defendants' good character did not necessarily render their defenses antagonistic, as even a person with a sterling reputation can commit a heinous crime.  Moreover, as the Court of Appeal correctly observed, strong evidence apart from any evidence of his co-defendants' peacefulness was sufficient to demonstrate Giugni's guilt.  Under the circumstances of this case, Giugni has not established that the state trial court's refusal to bifurcate the trial rendered his trial fundamentally unfair.  *Davis*, 384 F.3d at 638.

Claim Four: Ineffective assistance of counsel

Giugni next argues that trial counsel was ineffective for failing to request a jury instruction that self-defense is permitted even when the amount of force is excessive, unless it was "so excessive as to be clearly vindictive under the circumstances."

The Court of Appeal denied Giugni relief as follows:

> [G]iugni contends trial counsel was ineffective because he failed to seek an instruction that Giugni could only be convicted if the force he used to repel Pettaway's attack was "'so excessive as to be clearly vindictive under the circumstances.'"
>
> Giugni has not cited and we are not aware of any case that holds a court is obligated to instruct as he suggests.  Indeed, Giugni's argument on this point is based almost entirely on a passage from a single case; *People v. Ross* (2007) 155 Cal. App. 4th 1033.  There, the victim slapped the defendant during a confrontation, and the defendant responded by punching the victim in the face.  On appeal the court criticized the prosecutor's final argument for conflating the defendant's conduct with the consequence it produced:
>
> "[P]unching one's assailant in the face is not like shooting him in the head or stabbing him in the heart.  The test is not whether the force used appears excessive in

hindsight but whether it appeared reasonably necessary to avert threatened harm under the circumstances at the time.  The law grants a reasonable margin within which one may err on the side of his own safety, and so long as he is found to have done so reasonably, no abuse of the right of self-defense should be found to have occurred.  A leading forms book makes a similar point in a proposed jury instruction: '[I]n using force in self-defense, a person may use only that amount of force, and no more, that is reasonably necessary for that person's protection.  However, since in the heat of conflict or in the face of an impending peril a person cannot be expected to measure accurately the exact amount of force necessary to repel an attack, that person will not be deemed to have exceeded his or her rights *unless the force used was so excessive as to be clearly vindictive under the circumstances.*  Thus, a person's right of self-defense is limited by the reasonableness of his or her belief that such force was necessary at that time and under the particular circumstances.'  [Citations.]"  (*People v. Ross, supra,* 155 Cal. App. 4th at p. 1057, italics added.)

       While the *Ross* court did discuss whether a defendant's response was "clearly vindictive" it did so in a different context—while criticizing the prosecutor's argument. The court did not state and did not imply that a jury instruction on that concept was required under California law.  Cases are not authority for propositions that are not considered.  (*People v. Jones* (1995) 11 Cal. 4th 118, 123, fn. 2.)  Furthermore, it has long been recognized that language in an appellate decision which may be a good statement of the law or of the appellate court's reasoning does not necessarily make a good jury instruction.  (*People v. Adams* (1987) 196 Cal. App. 3d 201, 204-205; see also *People v. Colantuono* (1994) 7 Cal. 4th 206, 221, fn. 13 ["The discussion in an appellate decision is directed to the issue presented. The reviewing court generally does not contemplate a subsequent transmutation of its words into jury instructions and hence does not choose them with that end in mind.  We therefore strongly caution that when evaluating special instructions, trial courts carefully consider whether such derivative application is consistent with their original usage."])  We conclude trial counsel was not ineffective because he failed to seek an instruction based on the out-of-context passage upon which Giugni relies.

*Giugni*, 2011 WL 1134749, at *10-11.

       To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that his counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*  The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the

-15-

defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376,

1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at

393-95.  Thus, Giungi must show that defense counsel's representation was not within the range

of competence demanded of attorneys in criminal cases, and that there is a reasonable probability

that, but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,*

474 U.S. 52, 57 (1985).

An ineffective assistance of counsel claim should be denied if the petitioner fails to make

a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466 U.S. at 697

(courts may consider either prong of the test first and need not address both prongs if the

defendant fails on one).

In reviewing ineffective assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's determination"
> under the *Strickland* standard "was incorrect but whether that determination was
> unreasonable—a substantially higher threshold."  And, because the *Strickland* standard is
> a general standard, a state court has even more latitude to reasonably determine that a
> defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

It is through this highly deferential lens that a federal habeas court reviews *Strickland*

claims under the § 2254(d) standard.  *See Knowles*, 556 U.S. at 123 (citing *Yarborough v.*

*Gentry*, 540 U.S. 1, 5-6 (2003)).

Here, trial counsel was not deficient in failing to request a jury instruction not supported

by the law.  Any request for such an instruction would have been rejected for the reasons set

forth by the Court of Appeal, and counsel will not be deemed ineffective for failing to raise a

-16-

meritless issue.  *See Lockhart v. Fretwell*, 506 U.S. 364, 374 (1993) (O'Connor, J., concurring)

(failing to raise a meritless objection cannot constitute prejudice under a *Strickland* ineffective

assistance of counsel claim).  Thus, the Court of Appeal's conclusion that counsel was not

ineffective is neither unreasonable nor contrary to federal law.

Claim Five: Instructional error

Giungi next argues that CALCRIM No. 3470, the standard instruction on principles of

self-defense, was inadequate because it omitted the principle that a person is entitled to use

whatever level of force that "a reasonable person in similar circumstances would believe to be

reasonably necessary."  The Court of Appeal denied Giungi relief as follows:

> The trial court instructed the jurors on the principles of self-defense using
> CALCRIM No. 3470.  As is relevant here, the court told the jurors:
> "Self-defense is a defense to attempted murder, attempted voluntary
> manslaughter, aggravated mayhem, mayhem, battery with serious bodily injury and
> battery.  The defendant is not guilty of those crimes if he used force against the other
> person in lawful self-defense or defense of another.  The defendant acted in lawful self-
> defense or defense of another if:
> "One.  The defendant reasonably believed that he or someone else was in
> imminent danger of suffering bodily injury or was in imminent danger of being touched
> unlawfully;
> "Two.  The defendant reasonably believed that the immediate use of force was
> necessary to defend against that danger;
> "[And]
> "Three.  The defendant used no more force than was reasonably necessary to
> defend against that danger.
> "Belief in future harm is not sufficient, no matter how great or how likely the
> harm is believed to be.  The defendant must have believed that there was imminent
> danger of violence to himself or someone else.  Defendant's belief must have been
> reasonable and he must have acted because of that belief.  The defendant is only entitled
> to use that amount of force that a reasonable person would believe is necessary in the
> same situation.  If the defendant used more force than was reasonable, the defendant did
> not act in lawful self-defense or defense of another."
> Giugni now contends the standard CALCRIM instruction is inadequate because it
> omits the principle that "a person is entitled to use whatever level of force he reasonably
> believes to be necessary, if other people similarly situated would believe such force could
> reasonably be used, under similar circumstances."

-17-

The principle Giugni articulates is an essential aspect of self-defense.  Our Supreme Court has said that any right of self-defense is limited to the use of such force as is reasonable under the circumstances, and what is reasonable under the circumstances is determined from the point of view of a reasonable person in the defendant's position.  (*People v. Minifie* (1996) 13 Cal. 4th 1055, 1065.)  However, that principle is articulated in the standard CALCRIM self-defense instruction.  The instruction told the jurors that one of the essential elements of self-defense was that a defendant "used no more force than was reasonably necessary" and that a "defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in the same situation."  Reading the instruction as a whole as we are required to do (*People v. Ramos* (2008) 163 Cal. App. 4th 1082, 1088), we conclude the jurors were instructed correctly.

*Giugni*, 2011 WL 1134749, at *8-9 (footnote omitted).

Giungi fails to establish any error, much less an error of constitutional dimension.  The instruction as given was consistent with state law and embodied the very concept Giugni advocates.  Accordingly, he cannot prevail on his instructional error claim.

## V. CONCLUSION AND ORDER

Giugni is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the

issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

      Dated: June 6, 2014.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge
